FILED

AUG 2 2 2011

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY **ORIGINAL** DEPUTY

1  Michael Friedland (State Bar No. 157,217)
   mfriedland@kmob.com
2  Boris Zelkind (State Bar No. 214,014)
   boris.zelkind@kmob.com
3  Adam Powell (State Bar No. 272,275)
   adam.powell@kmob.com
4  KNOBBE, MARTENS, OLSON & BEAR, LLP
   12790 El Camino Real
5  San Diego, CA  92130
   Phone: (858) 707-4000
6  Facsimile: (858) 707-4001

7  Attorneys for Plaintiff
   AMRON INTERNATIONAL DIVING SUPPLY, INC.

8

9

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  AMRON INTERNATIONAL DIVING SUPPLY, INC., a California corporation, | Case No. **'11 CV 1890 H    JMA** |
| 15                Plaintiff, | **COMPLAINT FOR COMPUTER FRAUD AND ABUSE; TRADE SECRET** |
| 16       v. | **MISAPPROPRIATION; BREACH OF CONTRACT; BREACH OF CONFIDENCE; CONVERSION;** |
| 17  HYDROLINX DIVING COMMUNICATION, INC., a California | **TRESPASS TO CHATTELS; FRAUD; CONSTRUCTIVE FRAUD;** |
| 18  corporation; SAAD SADIK, aka TODD SADIK, aka JOHN SADIK, aka DALYA | **INTERFERENCE WITH PROSPECTIVE BUSINESS** |
| 19  ESTEPHAN, aka STEVEN MORALES, aka STEPHAN MORALES, aka FRANK | **ADVANTAGE; UNJUST ENRICHMENT; COMMON LAW AND** |
| 20  JASHUA, an individual, | **STATUTORY UNFAIR COMPETITION; COMMON LAW MISAPPROPRIATION;** |
| 21                Defendants. | **COMPUTER DATA ACCESS AND FRAUD; AND CONSPIRACY** |
| 22 | |
| 23 | **DEMAND FOR JURY TRIAL** |

24

25              **FILED UNDER SEAL**

26

27

28



Plaintiff AMRON INTERNATIONAL DIVING SUPPLY, INC. dba AMRON INTERNATIONAL, INC. ("AMRON") hereby complains of Defendants HYDROLINX DIVING COMMUNICATION, INC. ("HYDROLINX") and SAAD SADIK, aka TODD SADIK, aka JOHN SADIK, aka DALYA ESTEPHAN, aka STEVEN MORALES, aka STEPHAN MORALES, aka FRANK JASHUA ("SADIK"), (HYDROLINX and SADIK are referred to jointly as "Defendants"), and alleges as follows:

## JURISDICTION AND VENUE

1.      AMRON alleges causes of action arising under the Computer Fraud and Abuse Act.  This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1030(g) and 28 U.S.C. § 1331.

2.      This Court has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.  These claims derive from a common nucleus of operative facts and are so related that they form part of the same case or controversy.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the dispute occurred in this district and this Court has personal jurisdiction over each of the parties as alleged throughout this complaint.

## THE PARTIES

4.      Plaintiff AMRON is a corporation organized and existing under the laws of the State of California, having its principal place of business in this District at 1380 Aspen Way, Vista, California 92081.

5.      AMRON is informed and believes, and thereon alleges, that Defendant HYDROLINX is a corporation organized and existing under the laws of the State of California, having a place of business at 5933 Sea Lion Place, Suite 108, Carlsbad, CA 92008.

6.      AMRON is informed and believes, and thereon alleges, that Defendant SADIK is an individual residing in San Diego County, California, and is the founder of Defendant HYDROLINX.  AMRON further is informed and believes, and thereon alleges, that, in furtherance of the acts alleged herein, SADIK has operated under numerous aliases,

Complaint

including, but not limited to, the following: Todd Sadik, John Sadik, Dalya Estephan, Steven Morales, Stephan Morales, and Frank Jashua.

**STATEMENT OF FACTS**

**A.     AMRON's Business**

7.     AMRON is a leading manufacturer and supplier of diving, tactical, hyperbaric, and outdoor equipment for over 33 years.

8.     AMRON produces commercial diving equipment, including radios and unscramblers that allow divers and surface personnel to communicate with one another.

**B.     SADIK's Employment with AMRON**

9.     SADIK was employed by AMRON as an Electrical Engineer from October 2000 to April 23, 2010.

10.     On October 18, 2000, SADIK signed an Agreement for Nondisclosure of Trade Secrets. Among the terms of the Agreement for Nondisclosure of Trade Secrets are:

(a)     "I have this date entered into discussions and negotiations with [Amron]. As a direct result of said discussions and negotiations, certain technical information has been disclosed to me. I understand and agree that this information is of a confidential nature and that disclosure to unauthorized persons would constitute calculable loss to [Amron]. I will regard and preserve as confidential all information pertaining to [Amron] obtained to me from discussions, drawings, blueprints, manufacturing processes, and other sources of any kind as a result of these discussions and negotiations."

(b)     "I will not without written authorization from [Amron] disclose to others or attempt to cause manufacture of products, techniques, or client contracts related to these discussions and negotiations."

11.     On October 18, 2000, SADIK signed an Employee Invention and Secrecy Agreement. Among the terms and conditions of the Employee Invention and Secrecy Agreement are:

(a)     "I, Saad Sadik, agree to assign, and hereby do assign, to [Amron] all my interest in all ideas and inventions, whether patentable or not, made or conceived by me,

1   solely or jointly with others, during the term of my employment, except for any idea or

2   invention for which no equipment, supplies, facility, or trade secret information of [Amron]

3   was used and which was developed entirely on the Employee's own time, and (1) which does

4   not relate either to the business of [Amron] of [Amron]'s actual or demonstrably anticipated

5   research or development, or (2) which does not result from any work performed by the

6   Employee for [Amron]."

7        (b)   "I agree not to disclose to others, or take or use for my own purposes or

8   purposes of others, during or after my employment, any trade secrets, confidential

9   information, knowledge, data or know-how in [Amron]'s possession, whether or not by work

10   product. I agree that these restrictions shall also apply to (1) information, knowledge, trade

11   secret, data or know-how belonging to third parties in [Amron]'s possession, and (2)

12   information, knowledge, trade secret, or data conceived, originated, discovered or developed

13   by me. I recognize that this obligation applies not only to technical information, but also to

14   any business information that [Amron] treats as confidential."

15        (c)   "I agree that on termination of my employment, I will return to [Amron] all

16   things belonging to [Amron], and all copies of documents containing [Amron]'s trade secrets,

17   confidential information, knowledge, data or know-how in my possessions or control."

18        12.   On March 29, 2002, SADIK re-signed other versions of the Agreement for

19   Nondisclosure of Trade Secrets and Employee Invention and Secrecy Agreement.

20        13.   On March 29, 2002, SADIK also signed a Proprietary Information Agreement.

21   Among the terms and conditions of the Proprietary Information Agreement are:

22        (a)   "Employee agrees that during the course of his/her employment and his/her

23   termination, he or she will not divulge, communicate or use to the detriment of Amron

24   International, or to the benefit of any other person, or persons, or misuse in any other way,

25   any confidential information or trade secrets of the Company, including, but not limited to

26   know how, customer lists, distributor and/or sales representative lists, information pertaining

27   to suppliers or manufacturers utilized by the Company, information relating to distribution

28   methods, accounts, technical data in which the Company has a proprietary interest, or any

Complaint

1    other information not generally available to the general public relating to the Company's

2    business affairs or activities."

3        (b)    "Employee further agrees that the employee will not call on, solicit or take

4    away or attempt to call on, solicit or take away any of the clients, distributors, customers,

5    suppliers, or manufacturers who do business with the Company, either for himself/herself or

6    for any other business entity."

7        14.    On March 29, 2002, SADIK also acknowledged he received a copy of the

8    AMRON Employee Handbook and that he had read it in its entirety.  The AMRON Employee

9    Handbook contains a section entitled Office Equipment & IT Policies.  Among the terms and

10   conditions of the Office Equipment & IT Policies are:

11       (a)    "All electronic files; records, and communication, software, databases,

12   hardware, electronic storage media, digital files and telephone equipment remain the sole

13   property of the Company and are to be used only for Company business purposes.

14   Employees who use these systems for inappropriate purposes or who otherwise violate this

15   policy will be subject to discipline, up to and including termination of employment."

16       (b)    "Appropriate management may inspect the contents of employee's voice mail,

17   e-mail, computers, computer files or software to monitor job performance, for training or

18   quality control purposes, or when management suspects that the Company's property is being

19   used in an unauthorized manner."

20       (c)    "Under no circumstances, is the employee to use the Company's Internet

21   access to: Distribute or share unauthorized confidential information."

22       (d)    "Employees must comply with all software licenses, copyrights and other

23   applicable laws governing intellectual property.  This includes all software owned by the

24   Company and the employee when used for work purposes or installed on the Company's

25   equipment."

26       (e)    "No computers, peripherals, portables, cell phones or telephone equipment

27   may be reassigned, moved, disposed of or changed without the knowledge and written

28   approval of the MIS Group.  No piece of office equipment shall be altered, changed or

Complaint

improved upon without the explicit permission of the MIS Group. This includes introduction of new software, deletion of existing software, and alteration of network or workstation configurations."

15.    While employed at AMRON, SADIK had access to his normal workstation and two lab computers ("Test Bench 1" and "Test Bench 3") in a secluded office adjacent to his workstation.

16.    SADIK was terminated after an outburst on April 22, 2010, in which SADIK smashed computer equipment and stormed out of the building. After this outburst, AMRON did not allow SADIK to reenter the building.

17.    After SADIK's termination, AMRON attempted to access the two lab computers, but was unable to do so because SADIK had enabled password protection on both computers, Test Bench 1 and Test Bench 3.

18.    When AMRON asked SADIK for the passwords to Test Bench 1 and Test Bench 3, SADIK told AMRON that it should dispose of the computers. He even offered to help, stating that "it takes 10 minutes to destroy HD." SADIK said that Test Bench 3 was "worthless," and that he had not used it for three years. SADIK also told AMRON that, a "[l]ong time ago, I was setting the Bios Hard Drive configuration and accidentally saved a password. I do not know it and never used the computer since then." SADIK's representations to AMRON were false.

19.    Suspecting that SADIK had lied, AMRON contacted an IT consultant, Jose Guzman, who cleared the BIOS and Windows passwords for several drives on Test Bench 3 and Test Bench 1. Mr. Guzman informed AMRON that, contrary to SADIK's representations, Test Bench 3 had been in use over the past three years and, in fact, had been used very recently. Mr. Guzman's investigation revealed that files had been created, modified, and deleted on Test Bench 3 up until April 21, 2010, the day prior to SADIK's outburst and subsequent termination.

20.    On or around June 10, 2010 AMRON's newly hired Senior Electrical Engineer discovered computer programs named "BOMB" on Test Bench 1 and Test Bench 3.

Complaint

SADIK's "BOMB" files were intended to delete all files in specified directories and subdirectories on Test Bench 1 and Test Bench 3, in "quiet mode;" that is, without asking a user for permission to delete the files or displaying any message on the screen indicating that the files were being deleted.  Fortunately, SADIK was unable to execute the "BOMB," and they did not destroy AMRON's files.  At that time, AMRON had no reason to believe that SADIK had actually begun implementing his plot to steal AMRON's confidential information and open a competing business.

21.   On or about February 22, 2011, AMRON discovered that SADIK, under the alias "Todd Sadik," started his own diving communication company, named HYDROLINX, in direct competition with AMRON.  SADIK had an exhibit booth at the Underwater Intervention show.  The exhibit booth contained brochures for radios and unscramblers.  On March 22, 2011, AMRON received an e-mail from a customer asking for a quotation on an alternative to a radio produced by HYDROLINX. Less than a year after leaving AMRON, SADIK had started a competing company, and begun marketing competing products in a field that has taken AMRON three decades and millions of dollars in investment to develop.

22.   After learning that SADIK had opened a competing business, on March 25, 2011, AMRON began reviewing hard drives from Test Bench 1 and Test Bench 3.

23.   On about May 9, 2011, AMRON retained a computer forensic analyst, Sergio Kopelev to conduct a computer forensic analysis of the three computers used by SADIK at AMRON.

C.   **Results Of Computer Forensic The Investigation**

24.   The forensic analysis indicated that SADIK has copied more than a hundred thousand files from AMRON's computer systems for his own use, purged critical files from AMRON's computer systems, and interfered with AMRON's marketing and business development efforts.

25.   Test Bench 3 was discovered to contain 3 separate hard drives.  One of the hard drives was SADIK's personal hard drive, hand-labeled "Saad Home."  It appears that SADIK was using this personal hard drive and other drives to copy AMRON's computer files

Complaint

and transfer those files to his personal computer. SADIK's personal hard drive was plugged in to Test Bench 3 on numerous occasions and he copied and deleted more than 110,000 files from AMRON via the hard drives of Test Bench 3 as well as Test Bench 1.

26.     As many as 10 external USB devices, including external hard drives and USB "Flash Drives," had been plugged in to Test Bench 3. The forensic analysis indicates that SADIK copied files to these external devices.

27.     SADIK also copied numerous files that he was not authorized to access. The hard drive labeled "Saad Home," contained approximately 115,000 live and/or deleted files in directories labeled "Amron Work," "Confidential Work," and "Confidential Work Dengerus." These folders were often hidden behind several layers of "temp" folders containing "BOMB" programs located in the directories for quick deletion. This hard drive contained over 700 AutoCad "DWG" files related to AMRON's projects. These files related to AMRON's drawings as well as customers of AMRON.

28.     Additionally, "Saad Home" hard drive contained over 250 Bill of Materials files, including the details of the components for all of AMRON's products, including vendor part numbers and quantities. Approximately 50 of the Bill of Materials files were only found on this hard drive. This hard drive also contained nearly 2,000 files related to AMRON's internal test procedures, test results and vendor and customer quote information. The hard drive also contained over 15,000 editable Word product manual files and technical documents. At least 200 of these product manuals and technical documents were non public. The hard drive also contained more than 1,500 images containing the word "Amron" in the file or path name. Many of these images were confidential photographs of AMRON's products being tested, including photographs of the inside, top, back, and sides of AMRON's products that are not available to the public.

29.     Test Bench 3 also contained information regarding AMRON's vendors and customers. Although Test Bench 3 did not contain an active email program, Test Bench 3 contained at least 38 Outlook Personal Storage (PST) Folders containing tens of thousands of AMRON and personal e-mails. These e-mails included e-mails from SADIK and other

Complaint

AMRON engineers containing important customer, vendor and project information dating to 2001.  AMRON also found at least 25 emails SADIK sent to one of his SADIK's personal email accounts.  These emails contained source code and algorithms belonging to AMRON.

30.     AMRON is informed and believes, and thereon alleges, that from 2006 to 2010, SADIK saved all emails addressed to the "Manufacturing Group" pertaining to Return Materials Requests (RMR) to a special folder in Outlook.  Over 700 RMR-related e-mails were saved to Test Bench 3.  These emails contained the full information of the returns of AMRON's manufactured products, including product information, important customer names, contact information, shipping addresses, phone numbers, and fax numbers.

31.     On February 7, 2010 AMRON instructed SADIK to backup his important technical files to an external hard drive used by SADIK and AMRON's Vice President of Manufacturing for off-site engineering file backup.  SADIK did not backup his files onto the hard drive; instead, he accessed and copied thousands of files from this external hard drive, including nearly 9,000 files from AMRON's Vice President of manufacturing.  SADIK purged over ten thousand engineering files from AMRON's computer system.  These deleted files included several thousand assembly files, containing source code to operate digital signal processing chips developed in the course of AMRON's Helium Speech Unscrambler projects.   These deleted files also included at least 3000 files containing source code to program Field Programmable Gate Array parts on the AMRON Helium Speech Unscrambler.  These deleted files also included more than 5,000 C-language software files related to the Helium Speech Unscrambler projects.   These deleted files also included hundreds of OrCAD schematic design files related to a variety of AMRON projects.  These deleted files also included approximately 2,000 AutoCad drawings covering 150 current AMRON projects, as well as projects from the 1980's.  These files have been deleted from AMRON's computer system and are no longer in AMRON's possession.  Without these missing files, AMRON is unable to support functional changes to its product line without having to recreate years of engineering effort.

///

-8-

Complaint

32.     During his employment at AMRON, SADIK worked on AMRON's high priority Helium Speech Unscrambler project.  As part of his work on the Helium Speech Unscrambler project, SADIK  implemented a powerful, inexpensive audio processor chip.  AMRON purchased the development kits including hardware and software for the audio processor chips.  Upon completing a successful pre-production prototype, SADIK removed the audio processor chip from all subsequent AMRON designs without informing AMRON.  He modified AMRON's design to instead include a different, inferior design.  While using this different, less sophisticated design for AMRON's product, SADIK continued to work clandestinely on the inexpensive audio processor chip—while employed at AMRON using AMRON's equipment and facilities.   SADIK incorporated his clandestine work on the inexpensive audio processor chip into his new competing HYDROLINX Helium Speech Unscrambler.

33.     SADIK  also  used  AMRON  resources  to  convert  the  Helium  Speech Unscrambler software from a Dual Digital Signal Processor (DSP) to a more advanced and cost-effective Single DSP design.  SADIK did not, however, disclose this more advanced and cost effective solution to AMRON or implement it in AMRON's Helium Speech Unscrambler.  Instead, he eventually incorporated this more advanced single DSP design into his new competing HYDROLINX product line.

34.     SADIK  attempted  to  interfere  with  AMRON's  relationship  with  Perry Baromedical, an important customer of AMRON.  On April 20, 2008, SADIK told one of his associates, Salem Jibry ("Jibry"), about an upcoming quote that AMRON would be making to Perry Baromedical and instructed Jibry to submit a competing proposal.  SADIK told Jibry that SADIK would "bcc" Jibry on AMRON's quote to Perry Baromedical.  SADIK instructed Jibry to falsely represent to Perry Baromedical that Jibry was in the business of production contracting and engineering consulting and that he had the ability to manufacture equipment according to his engineer's specifications.  SADIK further instructed Jibry to tell Perry Baromedical that payment should be made to Jibry's business and told Jibry that AMRON's "Perry business will be switched to your business, at the product quantity order."  SADIK

even offered to defraud potential customers by posing as a Jibry Customer Service Representative and a Jibry's Design Engineer. SADIK told Jibry that he would respond to potential customers' emails using those aliases through false email addresses until Jibry's business was making enough money for SADIK to leave AMRON.

35.     AMRON is informed and believes, and thereon alleges, that SADIK planned to open a competing company years before he was terminated. SADIK'S actions while employed by AMRON were intended to benefit HYDROLINX. Presently, HYDROLINX's website includes product listings, price lists, and available stock for speakers, accessories, communications systems, and unscramblers.

36.     Ritchie, Brant, and other AMRON employees spent approximately 1,700 hours between March 21, 2011 and August 3, 2011 reviewing the hard drives and data contained therein, searching for files and data that SADIK had deleted and attempted to destroy, and attempting to recover data that SADIK attempted to purge.

37.     AMRON is informed and believes, and thereon alleges that Defendants have misappropriated and continue to misappropriate AMRON's confidential information, obtained under obligations of secrecy and confidentiality for the purpose of developing Defendants' own business to unfairly compete with AMRON.

38.     AMRON is informed and believes, and thereon alleges, that Defendants have used and disclosed and continue to use and disclose AMRON's confidential information, in willful and conscious disregard of a duty of confidence owed to AMRON.

39.     AMRON is informed and believes, and thereon alleges, that Defendants have committed and continue to commit unlawful business practices including, but not limited to, using AMRON's confidential information for Defendants' own purposes, and adversely to the interests of AMRON and its business venture.

40.     By the aforesaid acts of Defendants, AMRON has been greatly damaged, and will continue to be irreparably damaged unless Defendants are enjoined by the Court.

/ / /

/ / /

# FIRST CAUSE OF ACTION

## (COMPUTER FRAUD AND ABUSE ACT)

41.     AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 40.

42.     SADIK has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing a computer used for interstate commerce or communication, without authorization and by exceeding authorized access to such a computer and by obtaining information from such a protected computer, and so causing significant damage.

43.     SADIK has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by knowingly, and with intent to defraud AMRON, accessing a protected computer, without authorization or by exceeding authorized access to such a computer, and, by means of such conduct, furthered their intended fraud and obtained one or more things of value, including, but not limited to AMRON's technical engineering documents, manufacturing and testing procedures, bills of materials, pricing information, vendor information, and customer information.

44.     SADIK has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing a protected computer beyond the scope of the authorization granted, causing damage to AMRON, recklessly or without due regard for their actions.

45.     The computer system or systems that SADIK accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030.

46.     AMRON is informed and believes, and thereon alleges, that SADIK transferred many of these files to computers owned by HYDROLINX when developing HYDROLINX's competing Helium Speech Unscrambler.

47.     AMRON has been harmed by these violations, and its harm includes, without limitation, harm to AMRON'S data, programs, and computer systems and impairment of the integrity and availability of data, programs, systems, or information.  AMRON has further suffered damage and loss through the cost of responding to the offenses, including conducting damage assessments and restoring data, programs, systems, and or information to its

1   condition prior to the offenses.  These, as well as other losses and damages in an amount to be

2   determined at trial, amount to over $5,000 aggregated over a one-year period.

3       48.    Defendants' unlawful access to, and misappropriations from, AMRON's

4   computers also have caused AMRON irreparable injury.  Unless restrained and enjoined,

5   defendants will continue to commit such acts.  Damages are not adequate to compensate

6   AMRON for these actual and threatened injuries; AMRON is therefore entitled to injunctive

7   relief as provided by 18 U.S.C. § 1030 (g).

8                        **SECOND CAUSE OF ACTION**

9                     **(TRADE SECRET MISAPPROPRIATION)**

10      49.    AMRON hereby realleges and incorporates by reference the allegations set

11  forth in paragraphs 1 through 48.

12      50.    This is a cause of action for Misappropriation of Trade Secrets under the

13  Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, based upon Defendant's wrongful

14  and improper use and disclosure of AMRON's confidential information including, but not

15  limited to, AMRON's technical designs, schematics, diagrams, photos, and know-how, and

16  AMRON's vendor information, customer information, and know-how.

17      51.    AMRON's confidential information is trade secret because it derives

18  independent economic value from not being generally known to the public or to other persons

19  who can obtain economic value from its disclosure or use.

20      52.    Defendants gained access to AMRON's confidential information in the course of

21  an employee-employer relationship between SADIK and AMRON.  SADIK was under an

22  obligation to maintain the secrecy of the confidential information obtained during his

23  employment.

24      53.    AMRON took reasonable precautions under the circumstances to protect its trade

25  secrets, and all parties with access to the information were subject to obligations to maintain its

26  secrecy.

27  / / /

28  / / /

Complaint

54.     AMRON is informed and believes, and thereon alleges, that Defendants have and continue to use and disclose to third parties AMRON's trade secrets without AMRON's consent or permission, in attempting to develop Defendants' own competing business.

55.     AMRON is informed and believes, and thereon alleges, that Defendants have disclosed AMRON's trade secrets to third parties, maliciously and in willful and conscious disregard of the rights of AMRON.

56.     As a direct and proximate result of Defendants' willful, improper, and unlawful use and disclosure of AMRON's trade secrets, AMRON has suffered, and will continue to suffer, great harm and damage.   AMRON will continue to be irreparably damaged unless Defendant is enjoined from further use and disclosure of AMRON's trade secret information.

57.     The aforementioned acts of Defendants in wrongfully misappropriating AMRON's trade secrets, were and continue to be willful and malicious, warranting an award of exemplary damages, as provided by Civ. Code § 3426.3(c), and an award of reasonable attorneys' fees, as provided by Civ. Code § 3426.4.

## THIRD CAUSE OF ACTION

## (BREACH OF CONTRACT)

58.     AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 57.

59.     As a result of the Employee Invention and Secrecy Agreement, the Proprietary Information Agreement, and the Agreement for Nondisclosure of Trade Secrets, SADIK agreed to assign all of his work and ideas developed in the course of his employment to AMRON, not to disclose to others, or take or use for my own purposes or purposes of others, during or after my employment, any trade secrets, confidential information, knowledge, data or know-how.  SADIK also agreed not to solicit or take away AMRON's customers.

60.     Upon information and belief, SADIK has breached the Employee Invention and Secrecy Agreement, the Proprietary Information Agreement, and the Agreement for Nondisclosure of Trade Secrets by using AMRON's technical information for Defendants' business, failing to assign to AMRON all of his work developed at AMRON using

AMRON's facilities, disclosing AMRON's confidential information, and for attempting to solicit and take away AMRON's customers.

61. AMRON has fully performed all of the obligations and satisfied all conditions for performance under the Employee Invention and Secrecy Agreement, the Proprietary Information Agreement, and the Agreement for Nondisclosure of Trade Secrets.

62. SADIK has willfully and with conscious disregard for the contractual obligations owed to AMRON, breached the agreements.

63. Unless restrained and enjoined by the Court, SADIK will continue to breach the agreements.

64. As a foreseeable, direct and proximate result of SADIK's breach of contract, AMRON has suffered irreparable injury to its rights and pecuniary damages. AMRON will continue to suffer such injury, loss, and damage unless and until SADIK is required to assign to AMRON the work he performed for AMRON at AMRON's expense and using AMRON's equipment and facilities, enjoined from further use and disclosure of AMRON's confidential information.

65. SADIK has derived, received, and will continue to derive and receive from the aforementioned breach of contract, gains, profits and advantages, many of which are not presently known to AMRON.

66. AMRON is therefore entitled to injunctive relief or specific performance, as well as damages as provided by law.

## FOURTH CAUSE OF ACTION

## (BREACH OF CONFIDENCE)

67. AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 66.

68. This is a cause of action for Breach of Confidence under California common law.

69. When AMRON disclosed its confidential information to SADIK, it did so in confidence in the course of an employee-employer relationship, and, therefore, SADIK owed

Complaint

AMRON a legal duty of confidence to maintain the confidential information in a confidential and proprietary manner, and not to use the confidential information for SADIK's own purposes.

70. SADIK accepted the confidential information as alleged herein voluntarily and for the purpose of his employment with AMRON, thereby owing AMRON a duty of confidence with respect to AMRON's confidential information.

71. SADIK has willfully and in conscious disregard for the duty of confidence owed to AMRON, used for SADIK's own purposes and disclosed to others AMRON's confidential information.

72. As a direct and proximate result of SADIK's willful, improper, and unlawful use and disclosure of AMRON's confidential information, AMRON has suffered, and will continue to suffer, great harm and damage. AMRON will continue to be irreparably damaged unless Defendants are enjoined from further use and disclosure of AMRON's confidential information.

73. The aforementioned acts of SADIK, in breaching his duty of confidence owed to AMRON, were and continue to be willful, oppressive, fraudulent, and malicious, warranting an award of punitive damages in addition to the actual damages suffered by AMRON

## FIFTH CAUSE OF ACTION

## (CONVERSION)

74. AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 73.

75. AMRON has a right to possess its property as described herein.

76. Defendants willfully interfered with AMRON's ownership and possessory rights to such property, without lawful justification, with every intention of exercising those rights as though they were theirs. Defendants' intent to exercise dominion or control over the Property is incompatible with, and invasive of, AMRON's rights and has deprived AMRON of its ability to exclusively use and possess the Property.

77.   AMRON has been damaged as a result of defendants' actions.

78.   AMRON is entitled to damages, the nature and extent of which will be proved at trial.

79.   The aforementioned acts of Defendants were and continue to be willful, oppressive, fraudulent, and malicious, warranting an award of punitive damages in addition to the actual damages suffered by AMRON.

### SIXTH CAUSE OF ACTION

### (TRESPASS TO CHATTELS)

80.   AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 79.

81.   AMRON has ownership and a right to possess its protected and proprietary information.

82.   Defendants willfully interfered with AMRON's ownership and/or possessory rights to that information, without lawful justification, with every intention of exercising those rights as though they were theirs.

83.   Defendants' intent to exercise dominion or control over AMRON's protected and proprietary information is incompatible with, and invasive of, AMRON's rights and has deprived AMRON of its ability to exclusively use and possess its protected and proprietary information.

84.   Defendants' actions caused injury to AMRON and to its right to its property.

85.   AMRON is entitled to damages, the nature and extent of which will be proved at trial.

86.   The aforementioned acts of Defendants were and continue to be willful, oppressive, fraudulent, and malicious, warranting an award of punitive damages in addition to the actual damages suffered by AMRON.

/ / /

/ / /

/ / /

Complaint

## SEVENTH CAUSE OF ACTION

### (FRAUD)

87.     AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 86.

88.     Each and every representation, statement and omission to state a material fact by Defendants, as hereinabove alleged, was false, untrue or materially misleading, and Defendants knew such representations, statements, and omissions to state material facts to be false, untrue or materially misleading.

89.     Said misrepresentations, statements and omissions to state material facts were made by Defendants for the express purpose and with the intent to deceiving and defrauding AMRON.  Defendants knowingly concealed the true facts about SADIK's use of AMRON's computers to steal AMRON's information, destroy of AMRON's technical information, and interfere with AMRON's business.

90.     AMRON was ignorant of the falsity of Defendants' representations at the time they were made and AMRON believed them to be true. AMRON reasonably relied to its detriment upon Defendants' misrepresentations, statements and omissions to state material facts.

91.     By reason of Defendants' actions, AMRON has been damaged in the amount to be determined at trial.

92.     Defendants so acted with the intent to defraud AMRON and without any regard for the rights of AMRON. Defendants' actions were malicious, oppressive and fraudulent, entitling AMRON to an award of punitive damages in an amount necessary to punish Defendants and to deter such conduct in the future.

### EIGHTH CAUSE OF ACTION

### (CONSTRUCTIVE FRAUD)

93.     AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 92.

///

Complaint

94.     Acting with the intent to defraud AMRON, SADIK willfully breached his duties of confidence to AMRON by willfully and consciously disregarding his obligations to assign, disregarding the duty of confidence owed to AMRON, destroying AMRON's technical information, interfering with AMRON's business, stealing AMRON's computer files, using AMRON's confidential information for his own purposes and disclosing to others AMRON's confidential information.

95.     SADIK so acted with the intent to defraud AMRON and without any regard for the rights of AMRON. SADIK's actions were malicious, oppressive and fraudulent, entitling AMRON to an award of punitive damages in an amount necessary to punish Defendants and to deter such conduct in the future.

96.     By reason of SADIK's actions, AMRON has been damaged in the amount to be determined at trial.

97.     SADIK so acted with the intent to defraud AMRON and without any regard for the rights of AMRON. SADIK's actions were malicious, oppressive and fraudulent, entitling AMRON to an award of punitive damages in an amount necessary to punish SADIK and to deter such conduct in the future.

## NINTH CAUSE OF ACTION

### (INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE)

98.     AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 97.

99.     AMRON enjoys an economic relationship with many customers with which it has contracted in the past, and with which it expects to contract in the future.

100.    Defendants know of this relationship and the economic benefit it brings to AMRON because SADIK worked for AMRON and obtained AMRON's customer information during employment and thereafter formed HYDROLINX to use AMRON's customer information.

/ / /

/ / /

101.   Defendants have and continue to intentionally disrupt AMRON's relationship with AMRON's customers by attempting to convert AMRON's customers to their own both during SADIK's employment with AMRON and after SADIK's employment with AMRON.

102.   Defendants acts of intentional and wrongful disruption include the past and continuing wrongful use of AMRON's customer information; and the past and continuing unauthorized use of AMRON's trade secrets, constituting misappropriation of trade secrets.

103.   Defendants' intentional acts have actually and proximately caused a disruption of the economic relationship AMRON enjoys with its customers by wrongfully copying AMRON's valuable intellectual property and wrongfully drawing current and prospective customers away from AMRON.

104.   The aforementioned acts of Defendants were and continue to be willful, oppressive, fraudulent, and malicious, warranting an award of punitive damages in addition to the actual damages suffered by AMRON.

105.   Defendants' acts have resulted in a loss of beneficial economic relationships and actual profits to Plaintiffs.   Money damages would provide an insufficient remedy. Plaintiffs have no plain, speedy and adequate remedy at law and are entitled to injunctive relief.

## TENTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)

106.   AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 105.

107.   AMRON is informed and believe, and thereupon allege, that Defendants' conduct, as described above, has resulted in a benefit being conferred upon Defendants and Defendants' appreciation of the benefit in that Defendants have been able to get products to market without incurring the true development and design costs associated with the products, and Defendants have sold competing products wrongfully obtained.

108.   As a result, Defendants have been unjustly enriched, and Defendants obtained profits that in equity and good conscience belong to AMRON.

Complaint

109.   Defendants' acceptance and retention of this benefit under the circumstances render Defendants' retention of these benefits inequitable.

110.   As a result, AMRON is entitled to damages in an amount to be proven at trial.

111.   The aforementioned acts of Defendants were and continue to be willful, oppressive, fraudulent, and malicious, warranting an award of punitive damages in addition to the actual damages suffered by AMRON.

## ELEVENTH CAUSE OF ACTION

### (UNFAIR COMPETITION)

112.   AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 111.

113.   This is a cause of action for Unfair Competition under the California common law.

114.   The acts of Defendants, alleged herein, constitute unlawful, unfair, and fraudulent business practices in violation of the California common law of Unfair Competition.

115.   AMRON is informed and believes, and thereon alleges, that Defendants have willfully and in conscious disregard for AMRON's rights and its business, committed unfair and unlawful business practices including, but not limited to, stealing AMRON's computer information, using for Defendants' own purposes, and adversely to the interests of AMRON and its business venture, AMRON's technical and business information, destroying AMRON's technical information, and interfering with AMRON's business.

116.   The aforementioned acts of Defendants were and continue to be willful, oppressive, fraudulent, and malicious, warranting an award of punitive damages in addition to the actual damages suffered by AMRON.

117.   As a direct and proximate result of Defendants' willful, improper, and unlawful conduct, AMRON has suffered, and will continue to suffer, great harm and damage. AMRON will continue to be irreparably damaged unless Defendants are enjoined from further committing unfair and unlawful business practices against AMRON and AMRON's business.

/ / /

Complaint

## TWELFTH CAUSE OF ACTION

## (STATUTORY UNFAIR COMPETITION)

118.    AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 117.

119.    This is a cause of action for Statutory Unfair Competition under California Bus. & Prof. Code § 17200, et seq.

120.    The acts of Defendants alleged herein, including, but not limited to, Defendants' stealing of AMRON's computer information, using for Defendants' own purposes, and adversely to the interests of AMRON and its business venture, AMRON's technical and business information, destroying AMRON's technical information, and interfering with AMRON's business, constitutes unlawful, unfair, and fraudulent business practices in violation of California Bus. & Prof. Code § 17200, et seq.

121.    As a direct and proximate result of Defendants' willful, improper, and unlawful conduct, AMRON has suffered, and will continue to suffer, great harm and damage. AMRON will continue to be irreparably damaged unless Defendants are enjoined from further committing unfair and unlawful business practices against AMRON and AMRON's business.

## THIRTEENTH CAUSE OF ACTION

## (COMMON LAW MISAPPROPRIATION)

122.    AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 121.

123.    AMRON has invested substantial time and money in the development of its property, including confidential information related to its products, customers, and vendors.

124.    Defendants have appropriated the property at little or no cost.

125.    Plaintiff has been injured by Defendants' conduct.

126.    By reason of Defendants' actions, AMRON has been damaged in the amount to be determined at trial.

/ / /

Complaint

127.   The aforementioned acts of Defendants were and continue to be willful, oppressive, fraudulent, and malicious, warranting an award of punitive damages in addition to the actual damages suffered by AMRON.

## FOURTEENTH CAUSE OF ACTION

## (COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT)

128.   AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 127.

129.   SADIK has knowingly and without permission altered, damaged, deleted, destroyed, and otherwise used AMRON's data, computer, computer system, peripherals, and computer network in order to devise and execute a scheme or artifice to defraud, deceive, and/or extort.

130.   SADIK has knowingly and without permission accessed, caused to be accessed, and used AMRON's computers, computer systems, peripherals, computer networks, and data stored therein, in order to wrongfully obtain and control data and other information of monetary value.

131.   SADIK has knowingly and without permission taken, copied, and made use of data from AMRON's computers, computer systems, peripherals, and computer networks.

132.   SADIK has knowingly and without permissions used or caused to be used AMRON's computer services.

133.   SADIK has knowingly accessed and without permission added, altered, damaged, deleted, and destroyed AMRON's data, computer software, peripherals, and computer programs.

134.   SADIK has knowingly and without permission accessed or caused to be accessed AMRON's computers, computer systems, peripherals, and computer networks.

135.   SADIK acted with oppression, fraud, and malice, warranting an award of punitive damages in addition to the actual damages suffered by AMRON..

136.   SADIK's unauthorized access and use has damaged and caused loss to AMRON.

Complaint

137.   SADIK's conduct also caused irreparable and incalculable harm and injuries to AMRON and, unless enjoined, will cause further irreparable and incalculable injury, for which AMRON has no adequate remedy at law.

138.   SADIK's actions constitute violations of California Penal Code section 502(c).

## FIFTEENTH CAUSE OF ACTION

## (CONSPIRACY)

139.   AMRON hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 138.

140.   Defendants willfully, intentionally, and knowingly agreed, conspired, and combined with each other to engage in the alleged wrongful and illegal conduct described herein, including their computer fraud, trade secret misappropriation, breach of contract and breach of confidence, fraud, conversion, interference, unjust enrichment, misappropriation, and unfair competition.

141.   Defendants' wrongful and illegal conduct was pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by encouraging, ratifying, or adopting the conduct of each other.

142.   As a direct and proximate result of the conduct in furtherance of the conspiracy, AMRON has suffered injury, damage, loss, and harm.   The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

143.   Defendants' intentional agreement to commit these wrongful acts was willful, malicious, oppressive, and in conscious disregard of AMRON's rights.   AMRON is therefore entitled to an award of punitive damages to deter defendants' future wrongful conduct.

144.   AMRON is entitled to recover all actual damages that naturally and proximately resulted from the conspiratorial acts of defendants.   AMRON is also entitled to reasonable attorney fees.

/ / /

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, AMRON prays for judgment in its favor against Defendants for the following relief:

A.      That SADIK be adjudged to have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

B.      That Defendants be adjudged to have misappropriated AMRON's trade secrets in violation of the Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

C.      That SADIK be adjudged to have breached the Employee Invention and Secrecy Agreement, the Proprietary Information Agreement, and the Agreement for Nondisclosure of Trade Secrets contracts with AMRON, under the common law of the State of California, and that SADIK's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

D.      That SADIK be adjudged to have breached his duty of confidence owed to AMRON under the common law of the State of California, and that SADIK's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

E.      That Defendants be adjudged to have interfered with AMRON's ownership and possessory rights to AMRON's Property, including AMRON's confidential information and computer files, without lawful justification, with every intention of exercising those rights as though they were theirs, under the common law of the State of California, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

F.      That Defendants be adjudged to have interfered with AMRON's ownership and/or possessory rights to protected and proprietary information, under the common law of the State of California, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

/ / /

Complaint

G.  That Defendants be adjudged to have made representations, statements, and omissions of material fact that were false, untrue, and misleading for the express purpose of intending to deceive and defraud AMRON in violation of California Civil Code § 1572, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

H.  That SADIK be adjudged to have, acting with intent to defraud AMRON, breached his duties of confidence to AMRON by disregarding the duty of confidence owed to AMRON, in violation California Civil Code § 1573, and that SADIK's acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

I.  That Defendants be adjudged to have intentionally interfered with AMRON's prospective business advantage, under the common law of the State of California, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

J.  That Defendants be adjudged to have been unjustly enriched, under the common law of the State of California, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

K.  That Defendants be adjudged to have competed unfairly with AMRON, under the common law of the State of California, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

L.  That Defendants be adjudged to have competed unfairly with AMRON under California Business and Professions Code § 17200, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

M.  That Defendants be adjudged to have misappropriated AMRON's property that AMRON invested substantial time and money in developing, under the common law of the State of California, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

N.  That SADIK be adjudged to have violated the California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502 (c), and that SADIK's acts in doing so be adjudged oppressive, fraudulent, willful, malicious, oppressive, and done knowingly;

Complaint

O. That Defendants be adjudged to have conspired and combined with each other in the wrongful and illegal conduct described above, including their computer fraud, trade secret misappropriation, breach of contract and breach of confidence, fraud, constructive fraud, conversion, interference, unjust enrichment, misappropriation, and unfair competition, under the common law of the State of California, and that Defendants' acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

P. That Defendants, their respective agents, servants, employees and attorneys, and all those persons in active concert or participation with it, be forthwith temporarily, preliminarily and thereafter permanently enjoined, pursuant to Federal Rule Civil Procedure 65, 18 U.S.C. § 1030 (g), California Business and Professions Code § 17200, Uniform Trade Secrets Act, Cal. Civ. Code § 3426.2 and the common law of the State of California to assign to AMRON SADIK's ideas and inventions, patentable or not, developed while employed at AMRON using AMRON equipment and facilities; to return all of AMRON's property; and from further disclosing to any third parties any of AMRON's confidential information and unfairly competing with AMRON in any manner and that they have their computers and computer storage devices seized to recover AMRON's confidential information that Defendants will destroy if given the opportunity;

Q. That Defendants be directed to file with this Court and serve on Plaintiff within thirty (30) days after the service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction;

R. That Defendant be required to account to AMRON for any and all gains, profits and advantages derived by it, and all damages sustained by AMRON, by reason of Defendants' acts complained herein, including Defendants' breach of confidence and Defendants' common law and statutory unfair competition;

S. That the Court deem this case exceptional under 15 U.S.C. § 1117 and award AMRON reasonable attorneys' fees;

T. An order imposing a constructive trust for the benefit of AMRON over: (1) any trade secrets Defendants obtained from AMRON; (2) any profits, revenues, or other

1   benefits obtained by Defendants as a result of any disclosure or use of trade secrets obtained

2   from AMRON; (3) any confidential information obtained from AMRON; (4) any profits,

3   revenues, or other benefits obtained by Defendants as a result of any disclosure or use of

4   confidential information obtained from AMRON; and (5) SADIK's interest in all ideas and

5   inventions, whether patentable or not, made or conceived by him, solely or jointly with

6   others, during the term of his employment at AMRON; and

7        U.     Such other and further relief as this Court may deem just.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: 8-22-2011          By:_____
                               Michael K. Friedland
                               Boris Zelkind
                               Adam Powell

                               Attorneys for Plaintiff
                               AMRON INTERNATIONAL DIVING
                               SUPPLY, INC.

## DEMAND FOR TRIAL BY JURY

AMRON hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: 8 - 22 - 2011

By: _____
Michael K. Friedland
Boris Zelkind
Adam Powell

Attorneys for Plaintiff
AMRON INTERNATIONAL DIVING
SUPPLY, INC.

11650146
072711

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS029608
Cashier ID: kdelabar
Transaction Date: 08/22/2011
Payer Name: SAN DIEGO LEGAL SUPPORT SVCS
--------------------------------
CIVIL FILING FEE
  For: AMROM V. HYDROLINX, ET AL
    Case/Party: D-CAS-3-11-CV-001890-001
  Amount:        $350.00
--------------------------------
CHECK
  Check/Money Order Num: 103433
  Amt Tendered:  $350.00
--------------------------------
Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:      $0.00


There will be a fee of $45.00
charged for any returned check.
```