1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11 | AMRON INTERNATIONAL DIVING

SUPPLY, INC., a California corporation,

12 |                                    Plaintiff,

13

14 | vs.

15

16

17 | HYDROLINX DIVING

COMMUNICATION, INC., a California

18 | corporation; SAAD SADIK, a.k.a. TODD

SADIK, a.k.a. JOHN SADIK, a.k.a.

19 | DALEA ESTEPHAN, a.k.a. STEVEN

MORALES, a.k.a. STEPHAN

20 | MORALES, a.k.a. FRANK JASHUA, an

individual,

21

                                  Defendants.

22

CASE NO. 11-CV-1890-H (JMA)

**ORDER**

**(1) GRANTING DEFENDANTS'
MOTION TO DISMISS
PLAINTIFF'S CONSPIRACY
CAUSE OF ACTION AGAINST
DEFENDANT HYDROLINX;
AND**

**(2) DENYING THE
REMAINDER OF
DEFENDANTS' MOTION TO
DISMISS**

        Amron filed this action against Defendants on August 22, 2011.  (Doc. No. 1,

23
"Complaint.")  On September 13, 2011, Defendants Hydrolinx Diving Communication, Inc.
24
("Hydrolinx") and Saad Sadik ("Sadik") (collectively "Defendants") filed a motion to dismiss
25
Plaintiff Amron International Diving Supply, Inc. ("Amron")'s complaint. (Doc. No. 15.) On
26
October 17, 2011, Amron filed a response in opposition. (Doc. No. 18.)  The Court submitted
27
the matter on October 17, 2011.  (Doc. No. 19.)
28

**Background**

Amron is a leading manufacturer and supplier of diving, tactical, hyperbaric, and outdoor equipment for over 33 years. (Complaint at ¶ 7.) Amron produces commercial diving equipment, including radios and unscramblers that allow divers and surface personnel to communicate with one another. (Id. at ¶ 8.) Sadik was employed at Amron as an electrical engineer from October 2000 to April 23, 2010. (Id. at ¶ 9.) On October 18, 2000, Sadik signed an Agreement for Nondisclosure of Trade Secrets. (Id. at ¶ 10.) Among the terms of the Agreement for Nondisclosure of Trade Secrets are:

> (a)    I have this date entered into discussions and negotiations with [Amron]. As a direct result of said discussions and negotiations, certain technical information has been disclosed to me. I understand and agree that this information is of a confidential nature and that disclosure to unauthorized persons would constitute calculable loss to [Amron]. I will regard and preserve as confidential all information pertaining to [Amron] obtained to me from discussions, drawings, blueprints, manufacturing processes, and other sources of any kind as a result of these discussions and negotiations.
>
> (b)    I will not without written authorization from [Amron] disclose to others or attempt to cause manufacture of products, techniques, or client contracts related to these discussions and negotiations.

(Id. at ¶ 10(a) & (b).) As part of these agreements, Sadik assigned his interest in all ideas and inventions, whether patentable or not, made or conceived by him, solely or jointly with others, during the term of my employment and agreed not to disclose to others, or take or use for his own purposes or purposes of others, during or after his employment, any trade secrets, confidential information, knowledge, data or know-how in Amron's possession, whether or not by work product. (Id. at ¶ 11.) Plaintiff's complaint also alleges that Sadik agreed to return all things belonging to Amron and all copies of documents containing Amron's trade secrets, confidential information, knowledge, data or know-how in his possession or control after his employment ended. (Id. at ¶ 11.) On March 29, 2002, Sadik re-signed other versions of the Agreement for Nondisclosure of Trade Secrets and Employee Invention and Secrecy Agreement. (Id. at ¶ 12.) Sadik also signed a Proprietary Information Agreement on March 29, 2002. (Id. at ¶ 13.) This agreement stated that Sadik would not:

> divulge, communicate or use to the detriment of Amron International, or to the benefit of any other person, or persons, or misuse in any other way, any confidential

information or trade secrets of the Company, including, but not limited to know how, customer lists, distributor and/or sales representative lists, information pertaining to suppliers or manufacturers utilized by the Company, information relating to distribution methods, accounts, technical data in which the Company has a proprietary interest, or any other information not generally available to the general public relating to the Company's business affairs or activities.

(Id. at ¶ 13.)  The agreement also stated that Sadik agreed not to "call on, solicit or take away or attempt to call on, solicit or take away any of the clients, distributors, customers, suppliers, or manufacturers who do business with the Company, either for himself/herself or for any other business entity."  (Id.)

On March 29, 2002, Sadik also signed an acknowledgment that he received a copy of the Amron Employee Handbook and that he had read it in its entirety.  (Id. at ¶ 14.)  The Amron Employee Handbook contains a section entitled "Office Equipment & IT Policies." This policy states:

All electronic files; records, and communication, software, databases, hardware, electronic storage media, digital files and telephone equipment remain the sole property of the Company and are to be used only for Company business purposes.  Employees who use these systems for inappropriate purposes or who otherwise violate this policy will be subject to discipline, up to and including termination of employment.

(Id. at ¶ 14.)

Plaintiff's complaint alleges that Sadik was terminated on April 22, 2010 after an outburst in which Sadik smashed computer equipment and stormed out of the building. (Id. ¶ 16.)  During his employment at Amron, Sadik had access to his assigned computer workstation and two additional lab computers, "Test Bench 1" and "Test Bench 3." (Id. at ¶ 17.)  Sadik had protected the two computers with passwords.  (Id. at ¶ 17.)  After terminating Sadik, Amron asked Sadik for the passwords.  (Id. at ¶ 18.)  Sadik responded that he did not know them.  (Id.)  Sadik told Amron that a "[l]ong time ago, I was setting the Bios Hard Drive configuration and accidentally saved a password.  I do not know it and never used the computer since then."  (Id.)  Sadik also told Amron that Test Bench 3 was "worthless," and that he had not used it for three years.  (Id.)  Sadik told Amron to dispose of the computers. (Id. at ¶ 19.)  Sadik even offered to help, telling Amron that "it takes 10 minutes to destroy HD."  (Id. at ¶ 18.)

Suspecting that Sadik may have lied about the passwords, Amron contacted an IT consultant, Jose Guzman. (Id. at ¶ 19.) Guzman cleared the BIOS and Windows passwords for several drives on for Test Bench 3 and Test Bench 1 and discovered that files had been created, modified, and deleted on Test Bench 3 through April 21, 2010. (Id.) Contrary to Sadik's representations, Test Bench 3 was operational and in use by Sadik as recently as the day before his last day at Amron. (Id.)

On or about June 10, 2010, Amron's newly hired Senior Electrical Engineer discovered programs named "BOMB" on both Test Bench 1 and Test Bench 3. (Id. at ¶ 20.) Amron claims that the "BOMB" programs facilitated the ability to delete directories, including subdirectories, with traces of copying activity, in "quiet mode," without asking a user for permission or displaying any message on the screen. (Id.)

On or about February 22, 2011, Amron discovered that Sadik, under the alias "Todd Sadik," started his own diving communication company, named Hydrolinx Diving Communication, Inc.—Defendant Hydrolinx—and had an exhibit booth at the Underwater Intervention show. (Id. at 21.) The exhibit booth contained brochures for radios and unscramblers. (Id.) On March 22, 2011, Amron received an e-mail from a customer asking for a quotation on an alternative to a radio produced by Hydrolinx. (Id.)

Based on this information, Amron began reviewing hard drives from Test Bench 1 and Test Bench 3 on March 25, 2011. (Id. at ¶ 22.) On or about May 9, 2011, Amron retained a computer forensic analyst, Sergio Kopelev, to conduct a computer forensic analysis of the three computers used by Sadik at Amron. (Id. at ¶ 23.)

From this forensic investigation, Amron discovered that Sadik had copied more than a hundred thousand files from Amron's computer systems and purged thousands of engineering documents from Amron's computer systems. (Id. at ¶ 24.) At the time of the investigation, Test Bench 3 was discovered to contain 3 separate hard drives. (Id. at ¶ 25.) One of the hard drives was Sadik's personal hard drive, hand-labeled "Saad Home." (Id.) Kopelev determined that the "Saad Home" drive had previously been connected to Test Bench 3 and Sadik copied and deleted large amounts of data from Amron via the hard drives of Test Bench 3 and Test

1   Bench 1.  Additionally, at least 10 external USB devices, including external hard drives and

2   USB Flash Drives, had been plugged in to Test Bench 3, with evidence, indicating that Sadik

3   had copied files to these external devices.  (Id. at ¶¶ 25-26.)

4       The hard drive labeled "Saad Home," contained approximately 115,000 live or deleted

5   files in computer folders labeled "Amron Work," "Confidential Work," and "Confidential

6   Work Dengerus."  (Id. at ¶ 27.)  Amron's complaint alleges that Sadik often hid these folders

7   beneath several layers of "temp" folders containing "BOMB" programs located in the

8   directories for quick deletion.  (Id.)  The hard drive contained over 700 AutoCad "DWG" files

9   relating to Amron's projects.  (Id.)

10      Additionally, the "Saad Home" hard drive Sadik copied contained Amron drawings and

11  drawings belonging to Amron's customers.  (Id.)  In addition, Sadik copied more than 250 Bill

12  of Materials files, including details of the components for all of Amron's products, including

13  vendor part numbers and quantities.  (Id. at ¶  28.)

14      Sadik copied almost 2,000 files related to Amron's internal test procedures, test results

15  and vendor and customer quote information.  (Id.)  He copied over 15,000 editable Word

16  product manual files and technical documents.  (Id.)  At least 200 of these product manuals and

17  technical documents were confidential.  (Id.)  Sadik also copied more than 1,500 images

18  containing the word "Amron" in the file or path name.  (Id.)  Many of these images were

19  confidential photographs of Amron's products being tested, including photographs of the

20  inside, top, back, and sides of Amron's products that are not available to the public.  (Id.)

21      Sadik also copied information concerning Amron's vendors and customers.  (Id. at ¶

22  29.)  Amron found email files on Sadik's computer containing information regarding Amron's

23  customers and vendors.  (Id.)  Sadik also sent several emails to one of his personal email

24  accounts.  (Id.)  These emails contained  source code and algorithms belonging to Amron.

25  (Id.)  Plaintiff alleges that from 2007 to 2010, Sadik saved emails addressed to the

26  "Manufacturing Group" to a special folder.  (Id. at ¶ 30.)  These emails contained the full

27  information of the returns of all of Amron's manufactured products, including product

28  information, customer names, contact information, shipping addresses, phone numbers, and

1  fax numbers.  (Id.)  Finally, Sadik accessed and copied thousands of files from Amron's
2  technical archive storage library, containing back ups of critical technical files including nearly
3  9,000 files from Amron's VP of manufacturing.  (Id. at ¶ 31.)

4       In addition to the massive copying, Amron alleges that it discovered that Sadik purged
5  over ten thousand engineering files from Amron's computer system.  (Id.)  Sadik deleted
6  several thousand assembly files, containing source code to operate digital signal processing
7  chips developed in the course of Amron's Helium Speech Unscrambler projects.  (Id.)  Sadik
8  deleted at least 3,000 files containing source code to program Field Programmable Gate Array
9  parts on the Amron Helium Speech Unscrambler.  (Id.)  Sadik also deleted more than 5,000
10 C-language software files related to the Helium Speech Unscrambler projects.  (Id.)  Sadik
11 deleted hundreds of OrCAD schematic design files related to a variety of Amron projects.  (Id.)
12 Sadik deleted approximately 2,000 AutoCad drawings covering 150 current Amron projects,
13 as well as projects from the 1980's.  (Id.)  Without these missing files, Amron claims that it
14 is unable to support functional changes to its product line without having to recreate years of
15 engineering effort.  (Id.)

16      During his employment at Amron, Sadik worked on Amron's high priority and
17 confidential Helium Speech Unscrambler project, a project to develop a device to allow divers
18 to communicate while diving to depths that require Helium in the diver's air supply.  (Id. at ¶
19 32.)  As part of his work on the Helium Speech Unscrambler project, Sadik implemented a
20 powerful, inexpensive audio processor chip.  (Id.)  Upon completing a successful
21 pre-production prototype, Sadik removed the audio processor chip from all subsequent Amron
22 designs without informing Amron.  (Id.)  Sadik modified Amron's design to instead include
23 a different, inferior design.  (Id.)  While using this different, less sophisticated design for
24 Amron's product, Sadik continued to work on this personal project while employed at Amron
25 using Amron's equipment and facilities.  (Id.)  Eventually, Sadik incorporated that work and
26 chip into his new competing Hydrolinx Helium Speech Unscrambler.  (Id.)

27      Additionally, while employed at Amron, Sadik used Amron resources to convert the
28 Helium Speech Unscrambler software from a Dual Digital Signal Processor ("DSP") design

to a more advanced and cost effective Single DSP design.  (Id. at ¶ 33.)  Sadik did not disclose this more advanced and cost effective solution to Amron or implement it in Amron's production of its Helium Speech Unscrambler.  (Id.)  Instead, he eventually incorporated this more advanced DSP into his new competing Hydrolinx product line.  (Id.)

Furthermore, Amron alleges that it learned that Sadik had attempted to divert Amron's customers to other companies even while he was employed with Amron.  (Id. at ¶ 34.)  For example, on April 20, 2008, Sadik instructed one of his associates, Salem Jibry ("Jibry"), about an upcoming quote that Amron would be making to Perry Baromedical, an important Amron customer, and instructed Jibry to submit a competing proposal.  (Id.)  Sadik told Jibry that Sadik would "bcc" Jibry on Amron's quote to Perry Baromedical.  (Id.)  Sadik instructed Jibry to contact Perry Baromedical and falsely represent to Perry Baromedical that Jibry was in the business of "Production Contracting and engineering consulting service" and that he had the ability to manufacture equipment according to his engineer's specifications.  (Id.)  Sadik further instructed Jibry to tell Perry Baromedical that payment should be made to Jibry's business and, told Jibry that Amron's "Perry business will be switched to your business, at the product quantity order."  (Id.)  Amron alleges that Sadik even offered to defraud potential customers by posing as a Jibry Customer Service Representative and a Jibry Design Engineer.  (Id.)  Sadik told Jibry that he would respond to potential customers' emails using those aliases through false email addresses until Jibry's business was making enough money for Sadik to leave Amron.  (Id.)

Amron's complaint alleges all of these facts, among others, and alleges causes of action for (1) computer fraud and abuse; (2) trade secret misappropriation; (3) breach of contract; (4) breach of confidence; (5) conversion; (6) trespass to chattels; (7) fraud; (8) constructive fraud; (9) interference with prospective business advantage; (10) unjust enrichment; (11) common law and statutory unfair competition; (12) common law misappropriation; (13) computer data access and fraud; and (14) conspiracy.  (Complaint.)

///

///

11cv1890

1   **I.  Defendants' Motion to Dismiss**

2   <u>**Motion to Dismiss Standard**</u>

3         A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests

4   the legal sufficiency of the claims asserted in the complaint.  <u>Navarro v. Black</u>, 250 F.3d 729,

5   732 (9th Cir. 2001).  Rule 8(a)(2) requires that a pleading stating a claim for relief contain "a

6   short and plain statement of the claim showing that the pleader is entitled to relief."  The

7   function of this pleading requirement is to "give the defendant fair notice of what the . . . claim

8   is and the grounds upon which it rests."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555

9   (2007).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

10  detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement

11  to relief' requires more than labels and conclusions, and a formulaic recitation of the elements

12  of a cause of action will not do."  <u>Id.</u>  A complaint does not "suffice if it tenders 'naked

13  assertion[s]' devoid of 'further factual enhancement.'"  <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949

14  (2009) (quoting <u>Twombly</u>, 550 U.S. at 557).  "Factual allegations must be enough to raise a

15  right to relief above the speculative level."  <u>Twombly</u>, 550 U.S. at 555 (citing 5 <u>C. Wright &</u>

16  <u>A. Miller, Federal Practice and Procedure</u> § 1216, pp. 235-36 (3d ed. 2004)).  "All allegations

17  of material fact are taken as true and construed in the light most favorable to plaintiff.

18  However, conclusory allegations of law and unwarranted inferences are insufficient to defeat

19  a motion to dismiss for failure to state a claim."  <u>Epstein v. Wash. Energy Co.</u>, 83 F.3d 1136,

20  1140 (9th Cir. 1996); <u>see also Twombly</u>, 550 U.S. at 555.

21        Federal Rule of Civil Procedure 9(b) states, "[i]n alleging fraud or mistake, a party must

22  state with particularity the circumstances constituting fraud or mistake.  Malice, intent,

23  knowledge, and other conditions of a person's mind may be alleged generally."  The

24  requirements of Federal Rule of Civil Procedure 9(b) apply to claims alleging a "unified course

25  of fraudulent conduct."  <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1125 (9th Cir. 2009).  It

26  is established law, in the Ninth Circuit and elsewhere, that Rule 9(b)'s particularity

27  requirement applies to state-law causes of action.  <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d

28  1097, 1104 (9th Cir. 2003).  Where the complaint alleges both fraudulent and nonfraudulent

1   conduct, only the fraud allegations must be stated with particularity.  <u>Vess</u>, 317 F.3d at 1105

2   ("The rule does not require that allegations supporting a claim be stated with particularity when

3   those allegations describe non-fraudulent conduct.")  Further, "if particular averments of fraud

4   are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or

5   'strip' them from the claim.  The court should then examine the allegations that remain to

6   determine whether they state a claim."  <u>Id.</u> at 1106.

### **Discussion**

#### **A.  Unified Course of Fraudulent Conduct**

9       Defendants argue that Amron is required to plead all of its claims in this case with

10  particularity under Rule 9(b) because Amron has alleged a unified course of fraudulent conduct

11  by the Defendants and many of their claims, as pled, sound in fraud.  (Doc. No. 15-1 at 4.)

12  Amron contends that Defendants cited paragraphs from Amron's fraud cause of action and

13  concluded that the entire complaint sounds in fraud.  (Doc. No. 18 at 3.)  Instead, Amron

14  argues that its complaint alleges both fraudulent and non-fraudulent courses of conduct.  (<u>Id.</u>)

15  Amron references its causes of action for interference with prospective business advantage,

16  unfair competition, and statutory unfair competition as causes of action that are based on both

17  fraudulent and non-fraudulent conduct.  (<u>Id.</u> at 3-4.)  For example, Amron alleges that Sadik

18  instructed Jibry to submit a fraudulent quote to Perry Baromedical and volunteered to deceive

19  potential customers by using false aliases and email addresses.  (Complaint at ¶ 34.)  Amron

20  also alleges that Amron interfered with Amron's business in other ways by "wrongfully

21  drawing current and prospective customers away from Amron."  (<u>Id.</u> at ¶¶ 103, 115, and 120.)

22  These non-fraudulent allegations are based on Defendants' alleged interference with Amron's

23  business, and these allegations are unrelated to the Perry Baromedical incident that does

24  involve fraud.

25      Because Amron has alleged both fraudulent and non-fraudulent courses of conduct

26  within the complaint, the Court concludes that Amron's complaint does not allege a unified

27  course of fraudulent conduct.  Therefore, Amron's entire complaint need not satisfy the

28  heightened pleading requirements of Rule 9(b).

**B.  Fraud Based Causes of Action Against Sadik**

Defendants argue that Amron's allegations fail to meet the pleading requirements of Rule 9(b) because Amron's complaint "does not contain even a single allegation specific to Defendants' alleged fraudulent conduct in support of its fraud based causes of action." (Doc. No. 15-1 at 6.)  The Court disagrees.

Rule 9(b) requires that allegations of fraud be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." Kearns, 567 F.3d at 1124.  Under California law, the elements of fraud are (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e. to induce reliance; (4) justifiable reliance; and (5) resulting damage.  Robinson v. Helicopter Co., Inc. v. Dana Corp, 34 Cal. 4th 979, 990 (Cal. 2004).  Averments of fraud must be accompanied by "'the who, what, when, where, and how' of the misconduct charged." Kearns, 567 F.3d at 1124 (quoting Vess, 317 F.3d at 1106).

Rule 9(b) serves three purposes:  (1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints "as a pretext for the discovery of unknown wrongs"; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to "prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." Kearns, 567 F.3d at 1124 (citing In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1405 (9th Cir. 1996)).

Amron has plead the details of Sadik's alleged fraudulent conduct in thorough detail.  Amron specifically described Sadik's alleged theft and destruction of Amron documents.  For example, Amron's complaint alleges that Sadik stole approximately 115,000 files from Amron and identified the types of files that Sadik stole as "over 700 AutoCad 'DWG' files," "250 Bill of Materials files," "2,000 files related to Amron's internal test procedures," "15,000 editable word product manual files and technical documents," and "at least 38 Outlook Personal Storage (PST) folders containing tens of thousands of Amron and personal e-mails."

1 (Complaint at ¶¶ 27-29.)

2      Further, Amron plead that Sadik purged more than 10,000 engineering files from
3 Amron's computers while employed by Amron, and Amron identified what types of files Sadik
4 purged:  "at least 3,000 files containing source code to program Field Programmable Gate
5 Array parts on the Amron Helium Speech Unscrambler," and "more than 5,000 C-language
6 software files related to the Helium Speech Unscrambler," and "approximately 2,000 AutoCad
7 drawings covering 150 current Amron projects as well as projects from the 1980's."
8 (Complaint at ¶ 31.)  Here, Amron has plead the elements of Sadik's alleged fraud and alleged
9 that without these missing files, Amron is "unable to support functional changes to its product
10 line without having to recreate years of engineering effort." (Id.)  Further, Amron's complaint
11 also pleads in detail Sadik's deception related to Amron's most important products, the Helium
12 Speech Unscrambler, and Sadik's false representations to Amron regarding the use of Test
13 Bench 1 and Test Bench 3 in an attempt to convince Amron to conceal evidence of his
14 deception.  (Id. at ¶¶ 16-17, 32.)  Moreover, Amron also plead in detail at least one example
15 of the efforts Sadik made to interfere with Amron's relationship with Perry Baromedical, one
16 of Amron's customers, by detailing how Sadik instructed Jibry to falsely represent that Jibry
17 had a business with particular manufacturing abilities.  (Id. at ¶ 34.)

18      Based on the foregoing, the Court concludes that Amron's complaint satisfies Rule 9(b)
19 because Amron's complaint is specific enough to give Sadik notice of the particular
20 misconduct so that Sadik can defend against the charge and not just deny that he has done
21 anything wrong.  Kearns, 567 F.3d at 1124.  Further, Amron's complaint satisfies the fraud
22 pleading requirements of pleading the who, what, when, where, and how of the misconduct
23 charged.  Id.  Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's
24 complaint to the extent it relates to fraudulent based causes of action against Defendant Sadik.

25      **C. Fraud Based Causes of Action Against Hydrolinx**

26      Where a plaintiff asserts claims based on fraudulent conduct against multiple
27 defendants, the plaintiff must identify the role of each defendant in the alleged fraudulent
28 scheme.  Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th Cir. 2007).  However, the complaint

1   need not "identify *false statements* made by each and every defendant." Id. at 764 (emphasis

2   in original).   "Participation by each conspirator in every detail in the execution of the

3   conspiracy is unnecessary to establish liability, for each conspirator may be performing

4   different tasks to bring about the desired result." Id.   Rule 9(b) requires plaintiffs to

5   "differentiate their allegations when suing more than one defendant . . . and inform each

6   defendant separately of the allegations surrounding his alleged participation in the fraud . . .

7   In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum,

8   'identif[y] the role of [each] defendant[] in the alleged fraudulent scheme." Id. (quoting Moore

9   v. Kayport Package Express, Inc., 885 F.2d 531, 541 (9th Cir. 1989)).

10       Amron has specifically identified Hydrolinx's role in the fraudulent conduct.  Amron

11   alleged, for example, that Hydrolinx accepted stolen, confidential information from Sadik:

12   "Amron is informed and believes, and thereon alleges, that Sadik transferred many of these

13   files to computers owned by Hydrolinx when developing Hydrolinx's competing Helium

14   Speech Unscrambler."   (Complaint at ¶ 46.)   Amron further alleged that Hydrolinx

15   implemented this information into Hydrolinx's competing product line: "Sadik incorporated

16   his clandestine work on the inexpensive audio processor chip into his new competing

17   Hydrolinx Helium Speech Unscrambler" and "[Sadik] eventually incorporated this more

18   advanced single DSP design into his new competing Hydrolinx product line." (Id. at ¶¶ 32-

19   33.)  Amron further alleged that Sadik had authority, as Hydrolinx's sole employee, to act on

20   behalf of Hydrolinx because Sadik "is the founder of Defendant Hydrolinx."  (Id. at ¶ 6.)

21       Based on the foregoing, the Court concludes that Amron sufficiently identified

22   Hydrolinx's role in the fraudulent conduct by alleging that Sadik initiated some tortious acts

23   while employed at Amron and Hydrolinx completed the tortious acts.  The Court concludes

24   that Amron's complaint informs each defendant separately of the allegations surrounding their

25   alleged participation in the fraud. Swartz, 476 F.3d at 765.  Accordingly, the Court DENIES

26   Defendants' motion to dismiss Plaintiff's complaint to the extent it pertains to fraud based

27   causes of action against Hydrolinx.

28   ///

**D.  Constructive Fraud Cause of Action**

Defendants argue that "Plaintiff's constructive fraud claim should be dismissed for failure to allege that Defendants, other than Sadik, owed them a heightened duty of care or that there was a fiduciary relationship between Defendants and Plaintiff." (Doc. No. 15-1 at 9.) Amron contends that it has asserted its constructive fraud cause of action only against Sadik. (Doc. No. 18 at 8.)  Amron asserts that the constructive fraud cause of action does not name "Hydrolinx" or "Defendants." (Doc. No. 18 at 8.)  Accordingly, the Court DENIES Defendants' motion to dismiss Amron's constructive fraud claim as it pertains to Defendants, other than Sadik, because Defendants' motion is moot.

Amron's complaint sufficiently pleads constructive fraud against Sadik by alleging that "[a]cting with the intent to defraud Amron, Sadik willfully breached his duties of confidence to Amron by willfully and consciously disregarding his obligations to assign, disregarding the duty of confidence owed to Amron, destroying Amron's technical information, interfering with Amron's business, stealing Amron's computer files, using Amron's confidential information for his own purposes and disclosing to others Amron's confidential information. (Complaint at ¶ 94.)  The Court concludes that Amron has plead sufficient facts to satisfy Rule 9(b)'s requirement that allegations of fraud be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." Kearns, 567 F.3d at 1124.  Based on Amron's complaint, Sadik is on notice of the particular misconduct that encompasses the allegations of constructive fraud. Accordingly, the Court DENIES Defendants' motion to dismiss Amron's constructive fraud claim against Sadik.

**E.  Plaintiff's Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, and Fifteenth Causes of Action**

Defendants contend that Plaintiff's fourth, fifth, sixth, ninth, tenth, eleventh, twelfth, thirteenth, and fifteenth causes of action are preempted by California's Uniform Trade Secrets Act ("UTSA") because these claims rely on the same nucleus of facts as a claim for the misappropriation of trade secrets. (Doc. No. 15-1 at 10.)

1    Under California law, a common law claim that is based on the same nucleus of facts
2    as a claim for the misappropriation of trade secrets is preempted by UTSA. <u>Digital Envoy, Inc.</u>
3    <u>v. Google, Inc.</u>, 370 F. Supp. 2d 1025, 1034 (N.D. Cal. 2005).  However, state law claims that
4    rely on additional and different facts or theories of liability than those forming the basis for the
5    trade secret claim are not preempted by the UTSA.  <u>See</u> <u>E-Smart Techs., Inc. v. Drizin</u>, 2009
6    U.S. Dist. LEXIS 272 at *19-20 (N.D. Cal. Jan. 5, 2009) ("To the extent that the unfair
7    competition and conversion claims rely upon allegations of something other than
8    misappropriation of trade secrets, those claims cannot be preempted by the UTSA."); <u>see also</u>
9    <u>PostX Corp. v. Secure Data in Motion, Inc.</u>, 2004 U.S. Dist. LEXIS 24260 at *13-14 (N.D.
10   Cal. Nov. 20, 2004) (holding that the unfair competition claim was not preempted by the
11   UTSA because it was based on an alternative theory of liability, as well as on new facts).

12    In <u>Digital Envoy</u>, the plaintiffs brought claims of unfair competition and unjust
13   enrichment along with the UTSA claims.  <u>Id.</u> at 1029.  The court ruled that the UTSA
14   preempted the common law claims and granted the defendant's motion for partial summary
15   judgment.  <u>Id.</u> at 1035.  In that case, however, the plaintiff's claims for relief were "based on
16   identical facts alleged in its claim for misappropriation of trade secrets."  <u>Id.</u>  In the instant
17   case, Amron has alleged facts relating not only to Defendants' alleged misappropriation of
18   their intellectual property, but also to facts relating to causes of action for breach of
19   confidence, conversion, trespass to chattels, common law misappropriation, unjust enrichment,
20   interference with prospective business advantage, unfair competition and statutory unfair
21   competition claims, as well as conspiracy.  To the extent that these claims rely upon allegations
22   of something other than misappropriation of trade secrets, these claims cannot be preempted
23   by the UTSA.  The Court concludes that Amron's fourth, fifth, sixth, ninth, tenth, eleventh,
24   twelfth, thirteenth, and fifteenth causes of action do not allege claims for relief that were based
25   on identical facts as those claimed in its misappropriation of trade secrets.

26    Moreover, Defendants' motion to dismiss based on preemption cannot be addressed
27   until it is determined whether the allegedly misappropriated information constitutes a trade
28   secret.  At this point in the case, the status of the information is merely a matter of allegation

1   and until the distinction is made between Amron's allegedly misappropriated trade secret

2   information and its confidential or non-confidential proprietary non-trade secret information,

3   the question of preemption should not be addressed.  Other courts have held that the question

4   of preemption cannot be addressed prior to determining whether the allegedly misappropriated

5   information constitutes a trade secret.  See e.g., Genzyme Corp. v. Bishop, 463 F. Supp. 2d

6   946, 949 (W.D. Wis. 2006); Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.,

7   295 F. Supp. 2d 430, 437 (D. De. 2003); Stone Castle Fin. v. Friedman, Billings, Ramsey &

8   Co., 191 F. Supp. 2d 652, 658-659 (E.D. Va. 2002); Combined Metals of Chicago Ltd. P'ship

9   v. Airtek, Inc., 985 F. Supp. 827, 830 (N.D. Ill. 1997).

10          Accordingly, the Court DENIES Defendants' motion to dismiss Amron's complaint in

11   regards to Amron's fourth, fifth, sixth, ninth, tenth, eleventh, twelfth, thirteenth, and fifteenth

12   causes of action based on preemption.

13          **F. Plaintiff's Breach of Confidence Cause of Action**

14          Sadik argues that Plaintiff's cause of action for breach of confidence is barred because

15   Sadik and Defendants signed an integrated employment agreement. (Doc. No. 15-1 at 13-15.)

16   Sadik argues that because the employment agreement had an integration clause, Amron is

17   barred from alleging any common law breach of confidence claims because these claims

18   introduce new, extra-contractual liability.

19          The Court concludes that Sadik's argument is premature.  It is too early to construe

20   contract clauses to determine if they render entire causes of action redundant.  Further, Amron

21   has not cited any law for its position, other than the parol evidence rule.  The parol evidence

22   rule bars the admissibility of extrinsic evidence to explain the meaning of a written instrument.

23   The parol evidence rule is not a bar on plaintiffs ability to allege causes of action.

24   Accordingly, the Court DENIES Defendants' motion to dismiss to the extent that it relies on

25   Amron's breach of confidence cause of action.

26          **G. Plaintiff's Conspiracy Cause of Action**

27          Defendants argue that Amron's conspiracy cause of action is barred against Hydrolinx

28   because Hydrolinx did not owe an independent duty to Amron.  (Doc. No. 15-1 at 15.)  The

1  Court agrees.

2       A claim for civil conspiracy only allows recovery against a party that independently

3  owes a duty to the plaintiff.  Ferris v. Gatke Corp., 107 Cal. App. 4th 1211, 1225 (2003).

4  Indeed, "tort liability cannot arise vicariously out of participation in the conspiracy itself."

5  Ferris, 107 Cal. App. 4th at 1225; Chavers v. Gatke Corp., 107 Cal. App. 4th 606, 614 (2004).

6  Put simply, "a civil conspiracy to commit tortious acts can, as a matter of law, *only* be formed

7  by parties who are already under a duty to the plaintiff, the breach of which will support a

8  cause of action against them—individually and not as conspirators—in tort."  Chavers, 107

9  Cal. App. 4th at 614 (citing Applied Equipment Corp. v. Litton Saudi Arabia, Ltd., 7 Cal. 4th

10  503, 514 (Cal. 1994) (emphasis in original)).  Amron's conspiracy claim is not based on, nor

11  does it allege, a fiduciary or contractual relationship between Amron and Hyrdolinx.  Amron

12  does allege a confidential or fiduciary relationship with Sadik:  "When Amron disclosed its

13  confidential information to Sadik, it did so in confidence in the course of an employee-

14  employer relationship, and, therefore, Sadik owed Amron a legal duty of confidence to

15  maintain the confidential information in a confidential and proprietary manner."  (Complaint

16  at ¶ 69.)  Although Amron alleged a contractual or fiduciary relationship with Sadik, Amron

17  did not allege a contractual or fiduciary relationship between Hydrolinx and Amron.  Instead,

18  Amron's conspiracy claim against Hydrolinx attempts to impose a general duty not to defraud

19  or injure another person or property.  The Court disagrees that a general duty exists in the

20  absence of a contractual or fiduciary relationship.  Because Amron did not allege, nor does

21  there exist, a fiduciary or contractual relationship between Hydrolinx and Amron, the Court

22  GRANTS Defendants' motion to dismiss Amron's conspiracy cause of action against

23  Hydrolinx.

24  ///

25  ///

26  ///

27  ///

28  ///

1

**<u>Conclusion</u>**

2          Based on the foregoing, the Court GRANTS Defendants' motion to dismiss Amron's

3   conspiracy cause of action against Hydrolinx and DENIES the remaining portions of

4   Defendants' motion to dismiss Amron's complaint.

5

6          **IT IS SO ORDERED.**

7   DATED: October 21, 2011

8                                                    _____

9                                                    MARILYN L. HUFF, District Judge
                                                     UNITED STATES DISTRICT COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28